UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICOLA WILLIAMS, on behalf of herself and all others similarly-situated,<br><br>Plaintiff,<br>- against -<br><br>THE BETHEL SPRINGVALE NURSING HOME, INC.,<br><br>Defendant. | Docket No. 14-cv-09383 (NSR) (JCM)<br><br>ECF Case – Filed Electronically<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## PROPOSED FINDINGS OF FACT

**A.    The Parties.**

Defendant Bethel Springvale Nursing Home, Inc. ("Bethel") is a 200-bed, not-for-profit skilled nursing facility located in Croton-on-Hudson, NY, that has been dedicated to the care of the elderly for over 100 years. (Declaration of Richard Keener ("Keener Decl."), ¶¶ 3-4; Declaration of Margie Graham ("Graham Decl."), ¶ 2; Declaration of Karen Werlau ("Werlau Decl."), ¶ 2; Declaration of Michael Tayo ("Tayo Decl."), ¶ 2). At all relevant times, Bethel employed over 450 employees. (Keener, at 187:4-7).[1]

Plaintiff Nicola Williams ("Plaintiff") was employed by Bethel as a Registered Nurse Charge Nurse from March 19, 2012, through August 18, 2014, at which time she was terminated for job abandonment. (Declaration of Nicola Williams ("Williams Decl."), ¶ 3; Williams at 12:7-14; Keener Decl., ¶¶ 7, 20). As an RN Charge Nurse, Plaintiff reported to the RN Supervisor, who reported to the Assistant Director of Nursing ("ADON"), who reported to the Director of Nursing ("DON"). (Keener Decl., ¶ 6). Plaintiff typically worked from 11:00 p.m. to 7:15 a.m. (the "Night Shift"), and was paid a regular rate of pay of $35.00

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

---

[1] References to witness trial testimony will be cited by using the witnesses' last names and the corresponding page and line of the trial transcript.

1

per hour and an overtime rate of $52.50 per hour for hours worked over 40 in a given week. (Williams Decl., ¶ 6; Keener Decl., ¶ 25; Def's Trial Exs. 19-20). As a full-time RN Charge Nurse, Plaintiff was typically scheduled to work 37.5 hours per week, or 7.5 hours per day. (Williams Decl., ¶ 6; Keener Decl., ¶¶ 8-9; Def's Trial Exs. 19-20).

**B.     Bethel's Time-Keeping, Payroll, Overtime and Meal Break Policies.**

Bethel's Employee Handbook contains all relevant policies regarding employee payroll, overtime, meal breaks and pay errors. (Keener Decl., Ex. A; Plf's Trial Ex. A). Bethel's lawful policy is and was to pay overtime to an employee who works more than 40 hours in a given workweek (*Id.*) Given the significant number of employees at Bethel, employees were required, where possible, to obtain pre-approval for working overtime from management. (Graham Decl., ¶ 6; Werlau Decl., ¶ 9; Tayo Decl., ¶ 6).

However, Bethel recognizes that certain scenarios make it implausible for an RN Charge Nurse to obtain pre-approval for overtime and, in those situations, the nurse is required to let his/her supervisor know that he/she worked overtime and provide the reason. (Keener Decl., ¶ 18). However, these situations were not common and were typically only required if there was late relief from the nurse on the next shift or in a resident emergency situation. In those instances, the nurse was required to notify management of the overtime worked so that he/she could be properly compensated. (Werlau Decl., ¶ 12; Tayo Decl., 7-9). RN Nurse Supervisors, like Michael Tayo ("Tayo"), had no authority to deny an overtime request and would simply sign their name to verify the requesting nurse's claim to the hours worked. (Werlau at 273:5-276:14; Tayo at 292:4- 295:21, 307:5-308:12). Only the ADON or DON could reject an overtime request submitted after the fact. However, in practice, this was extremely rare. (*Id.*) Plaintiff offered no credible evidence to the contrary at trial.

Bethel's meal break policy,ncludes contained in the Employee Handbook, recognizes that RN Charge Nurses who work a shift of more than 6 hours receive an unpaid

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

2

meal break of at least 30 minutes (typically 45 minutes in length), which is automatically deducted from the nurse's paycheck. (Keener Decl., ¶ 19 & Ex. A; Plf's Trial Ex. A). RN Charge Nurses are required to inform management if they are unable to take their meal breaks, in which case they are compensated for such time. (Graham Decl., ¶ 8; Werlau Decl., ¶ 13; Tayo Decl., ¶ 11). RN Charge Nurses, like Plaintiff, value their time and it is rare for a nurse to work through an entire meal break. (Tayo Decl., ¶ 12-13). Indeed, Tayo recalls having enjoyed meal breaks with Plaintiff who was quite fond of sharing her Jamaican cuisine. (Tayo, at 316:9-21).

At the end of each pay period, a scheduling coordinator goes through the time and attendance records and approves each person's two-week timecard. For those days when an employee worked past his/her scheduled hours, or worked through his/her lunch break, the employee would need to have notified management so that the nurse could be properly compensated. (Keener Decl., ¶ 11; Graham at 240:5-243:3).

No managerial employee was or is directed by executive or upper level management to limit payment of overtime or other pay to RN Charge Nurses; to stay within any payroll budget set by Bethel; or to apply any policy other than Bethel's lawful policy contained in its Employee Handbook. (Graham Decl., ¶ 15; Werlau Decl., ¶ 18; Tayo Decl., ¶ 17). Again, Plaintiff offered no credible evidence to the contrary at trial.

Lastly, as a safeguard measure, the Employee Handbook contains a policy on "Pay Errors," which directs employees to carefully scrutinize their paychecks to ensure accuracy of pay and time off accruals. If the employee discovers an error concerning his/her pay check, he/she is expected to promptly bring it to management's attention. (Def's Trial Ex. 7; Keener Decl., ¶ 13). The policy is in place to resolve such discrepancies and ensure that employees are paid for their work. (Keener Decl., ¶ 14).


meal break of at least 30 minutes (typically 45 minutes in length), which is automatically deducted from the nurse's paycheck. (Keener Decl., ¶ 19 & Ex. A; Plf's Trial Ex. A). RN Charge Nurses are required to inform management if they are unable to take their meal breaks, in which case they are compensated for such time. (Graham Decl., ¶ 8; Werlau Decl., ¶ 13; Tayo Decl., ¶ 11). RN Charge Nurses, like Plaintiff, value their time and it is rare for a nurse to work through an entire meal break. (Tayo Decl., ¶ 12-13). Indeed, Tayo recalls having enjoyed meal breaks with Plaintiff who was quite fond of sharing her Jamaican cuisine. (Tayo, at 316:9-21).

At the end of each pay period, a scheduling coordinator goes through the time and attendance records and approves each person's two-week timecard. For those days when an employee worked past his/her scheduled hours, or worked through his/her lunch break, the employee would need to have notified management so that the nurse could be properly compensated. (Keener Decl., ¶ 11; Graham at 240:5-243:3).

No managerial employee was or is directed by executive or upper level management to limit payment of overtime or other pay to RN Charge Nurses; to stay within any payroll budget set by Bethel; or to apply any policy other than Bethel's lawful policy contained in its Employee Handbook. (Graham Decl., ¶ 15; Werlau Decl., ¶ 18; Tayo Decl., ¶ 17). Again, Plaintiff offered no credible evidence to the contrary at trial.

Lastly, as a safeguard measure, the Employee Handbook contains a policy on "Pay Errors," which directs employees to carefully scrutinize their paychecks to ensure accuracy of pay and time off accruals. If the employee discovers an error concerning his/her pay check, he/she is expected to promptly bring it to management's attention. (Def's Trial Ex. 7; Keener Decl., ¶ 13). The policy is in place to resolve such discrepancies and ensure that employees are paid for their work. (Keener Decl., ¶ 14).

LAW OFFICES
Peckar & Abramson
A Professional Corporation

At all relevant times, RN Charge Nurses were required to clock-in and out of their shifts at one of two time clocks in the facility (one in the basement and one on the first floor) by swiping their finger using a scanner and entering their employee identification number. (Keener Decl., ¶ 11; Williams at 13:16-14:15). Plaintiff's swipes were recorded and produced at trial on Bethel's Detail Punch Report. (Def's Trial Ex. 19). Employees do not clock in and out for meal breaks.

### (1)  *Plaintiff's Admitted Training and Re-Training on All Applicable Bethel Policies.*

During Bethel's system-wide orientation, all new employees are instructed about the timekeeping policies and on the appropriate methods to use when clocking in and out to ensure that all employees are properly paid for all time worked. RN Charge Nurses were periodically reminded of and counseled and trained by the supervisory staff on these policies. (Graham Decl., ¶¶ 10-12; Werlau Decl., ¶¶ 4, 8, 7, 11, 15; Tayo Decl., ¶¶ 8, 15 17). Notably, in late 2013, the (then) ADON, Karen Werlau ("Werlau") conducted a facility wide in-service of all licensed nurses, including RN Charge Nurses and Plaintiff herself, regarding the importance of strict compliance with Bethel's timekeeping, meal break and overtime approval policies. (Graham Decl., ¶ 11; Werlau Decl., ¶ 16; Werlau at 273:5-15). Plaintiff did not deny this.

Plaintiff acknowledged receipt of Bethel's lawful overtime and meal break policies and admitted at trial to having been trained and retrained on same. (Keener Decl., ¶ 12; Def's Trial Ex. 13; Williams, at 16:15-18:24). Specifically, Plaintiff testified at trial that she understood: (1) she was required to get overtime pre-approved if possible and could request to be paid overtime after the fact (Williams, at 16:15-18:12); (2) Bethel's policy concerning automatic deduction of meal breaks (*Id.* at 17:15-17); and (3) that she could request to be compensated for a missed meal break (*Id.* at 18:13-24). When Plaintiff followed the

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

4

appropriate overtime procedures, she received overtime pay. In fact, Plaintiff admitted at trial that Bethel's payroll records, reflecting the fact that Plaintiff earned $14,430.26 in total overtime pay (274.86 hours) during her time at Bethel, are accurate. (Williams, at 35:10-39:7; Plf's Trial Ex. E).

Bethel has historically required strict adherence to these wage and hour policies and has disciplined nursing staff who fail to follow them. (Graham Decl., ¶¶ 12-14). In fact, as a result of Plaintiff having been disciplined for Plaintiff failing to adhere to Bethel's overtime policy, Plaintiff entered into a signed agreement wherein she acknowledged Bethel's overtime and timekeeping policies in March 2014. (Def's Trial Ex. 13). Nevertheless, even after signing an agreement with Bethel that she would abide by Bethel's overtime policy, and even after Werlau's extensive in-service on that subject, Plaintiff failed to do so and claims that she continued to perform unauthorized overtime. (Williams, at 74:12-16).

C. **Plaintiff's Overstated and Meritless Claim to Unpaid Overtime, Off-The-Clock Work and Missed Meal Breaks.**

Plaintiff has failed to clearly prove a claim for damages for unpaid overtime, missed meal breaks or off the clock work in this action. Indeed, Plaintiff never even alleged an off the clock claim in the three complaints she has filed.

Plaintiff's unpaid overtime claim is all over the map. Each complaint Plaintiff filed in this action states that she worked *a total* amount between 41.25 to 45 hours per week. (*Cf*, Complaint, First Amended Complaint ("FAC") and Second Amended Complaint ("SAC"), ECF Nos. 1, 23, 36). Notably, Neither the Complaint, the FAC nor the SAC make any mention of an entitlement to off the clock pay. (*Id.*) In fact, Plaintiff alleged the *opposite*, namely that she only clocked out of work when she was finished with her work and that she "properly recorded the hours she worked using Defendant's fingerprint scanning system."

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

5

(SAC, ¶¶ 23-24). For her to show up in Court alleging she worked a significant amount of off-the-clock hours is simply disingenuous.

Further, in Plaintiff's sworn Answers to Interrogatories, she could not recall a specific amount of unpaid overtime she alleges to have worked. (Def's Trial Ex. 5, at No. 5). Plaintiff disingenuously claimed at trial that she could not understand the question fully. (Williams 32:23-34:2).

Then, in opposing summary judgment, Plaintiff alleged under oath for the first time that she worked an average of 6-8 hours of unpaid overtime per week (ECF No. 63-25), a marked deviation from her three prior sworn pleadings. This newfound claim to unpaid overtime also represented a significant departure from Plaintiff's statement, again made under oath, to the New York State Department of Labor ("NYDOL"). (Def's Trial Ex. 6). Only weeks after her termination from Bethel, Plaintiff told the NYDOL that she was owed approximately $10,000 in unpaid wages. (*Id.*) Plaintiff admitted this fact at trial. (Williams, at 58:10-22).

Yet, to further obfuscate her claim, Plaintiff then showed up at trial with an inflated "damages calculation" that includes a panoply of new assumptions and exaggerations. (Plf's Trial Ex. BP). Indeed, Plaintiff's "damages calculation" is so full of errors and extreme exaggerations, that the Court should discredit it in its entirety.

First, Plaintiff claims, without any credible evidentiary support whatsoever, that she was "required" to work an average of 7 off the clock hours *per week*. Again, Plaintiff never made this allegation in any 3 of her pleadings, and such allegation is absent from her sworn Answers to Interrogatories, nor could Plaintiff explain how the payroll records would be needed to arrive at such a figure. (Def's Trial Ex. 5). Plaintiff still cannot recall a single date when she was allegedly told to clock out and go back to work and admits that no supporting documentary proof exists. (Williams, at 28:1-19). Nonetheless, Plaintiff would have this

Court believe that, in addition to the 274.86 hours of overtime for which Plaintiff admits she was paid (Plf's Trial Ex. E), Plaintiff was not paid for hundreds of additional hours she claims that she worked off the clock.

This contention rests on Plaintiff's bold assertion that her supervisors told her to clock out and return to work. (Plf's Decl., ¶¶ 17-18). This claim is also without any factual support, however, as Plaintiff: failed to identify any supervisor who did this in her sworn Answers to Interrogatories and, in fact, said she was unable to do so (Def's Trial Ex. 5, at No. 5); she then claimed it was "Rupa" during her deposition (Williams at 28:22-29:4) when the undisputed testimony at trial showed that Rupa was only employed at Bethel until mid-2012 (Keener, at 190:15-191:6); and she then claimed for the first time at trial that it was Tayo, who vehemently denied ever doing so. (Tayo, at 315:24-216:5). Critically, not a single one of Plaintiff's witnesses supported this allegation at trial. Cornelia Roberts-Pryce ("Pryce") expressly denied having ever been told to clock out and return to work. (Pryce, at 117:12-14). And Ms. Pryce's testimony was also unhelpful as she testified that when Tayo learned that she had clocked out and returned to work, which she did completely on her own accord and not at anyone's direction, Tayo counseled her *against* doing that. (Pryce, at 120:19-132:23).

Plaintiff also gave false testimony when she claimed during cross-examination that Mr. Keener came up to the Rehab Unit and told her to clock out:

> Q. But you didn't submit and – you too the time to submit a time sheet. Why didn't you submit a time sheet that said you worked off the clock?
> A. They didn't have time sheet for working off the clock. They tell you point-blank clock out and go back and finish. They never had the time sheet for that.
>
> Q. Who is "they"? Mr. Tayo.?
> A. Mr. Tayo, Mr. Keener, Rupa, and Karen Werlau would sometimes tell you, oh, it's 9:00, clock out.
>
> Q. Wait a minute,. YOure telling me Mr. Keener told you tyo clock out and go back to work?
> A. Yeah yeah. He said came up from downstairs and said you guys are here late. Its late.

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

7

> Q. Is there some reason –
> A. I said I'm still doing my work. He said you got to clock out and come back.
>
> Q. Your testimony is that the gentleman sitting to my left came upstairs from HR and told you to clock out and go back to work?
> A. Yes. (Williams at 63:11-64:5).

Again, this testimony was directly contributed by her Complaints, her interrogatory answers, and her deposition. (Def's Trial Ex. 5 at No. 5; SAC, *passim*).

Plaintiff's other witness, Marsha Ellis ("Ellis"), tried to testify that Bethel wrongfully denied her overtime and refused to pay for missed meal breaks on various occasions. She gave the provably false testimony that she only submitted two requests for overtime when employed at Bethel, but quickly changed her story when confronted with the abundant documentary proof that directly contradicted her testimony. (Ellis at 141:16-156:17; Plf's Trial Ex. AV).

On the other hand, Bethel's witnesses, former DON Margie Graham ("Graham"), former ADON Karen Werlau ("Werlau"), current Director of Human Resources Richard Keener ("Keener") and Michael Tayo, each, vehemently and rather convincingly, denied ever having told an employee to clock out and return to work or of being aware of any instances where that happened. (Keener, at 190:15-192:3; Graham, at 244:23-245:10; Werlau, at 244:23-245:10; Tayo, at 315:24-216:5).

Plaintiff's off the clock allegation is further belied by the fact that Plaintiff submitted numerous requests for overtime amounts of all sizes, including one for 26 minutes on November 8, 2012, when the relieving nurse showed up late, all of which were approved. (Williams, at 64:22-66:3). Yet, for some reason she cannot credibly explain, Plaintiff did not request the alleged ***7 extra hours of off the clock work she claims she performed that week***. (Plf's Trial Ex. BP).

8

Moreover, Plaintiff's damages calculation is demonstrably overstated because the claimed amounts do not include the overtime for which Plaintiff admits she was paid, and also do not credit the 45-minute meal breaks actually taken. Thus, Plaintiff makes the ill-supported claim that she missed her meal break, on the Night Shift (the evidence showed that a meal break on a 11:00 p.m. to 7:15 a.m. shift would likely be taken around 3:00 or 4:00 a.m., when most if not all residents are fast asleep), *every single day*. (Plf's Decl. ¶ 9). At trial, however, Plaintiff told a different story, admitting she received her meal breaks "sometimes." (Williams at 74:17-75:24). Nonetheless, Plaintiff still seeks damages for allegedly missing her meal break *on every single shift she ever worked at Bethel*, even though her sworn declaration submitted as her direct trial testimony (incorrectly) states that she subtracted all meal breaks actually taken from her damages calculation. (*Cf.* Plf's Trial Ex. BP with Williams Decl., ¶ 26; Williams, at 74:17-75:24, 107:10-108:9). When asked at trial about this gaping hole in her damages model, Plaintiff could not explain it. (Williams, at 107:10-108:9).

Nonetheless, Plaintiff failed to present the Court with a single shred of evidence that she missed any of her meal breaks. In fact, Tayo gave unrebutted testimony that Plaintiff loves to cook and would often bring Jamaican food to work for lunch and even offered to share it with him. (Tayo, at 316:9-21). Further, Plaintiff's own witness, Pryce, testified that Tayo encouraged nurses to take their meal breaks. (Pryce, at 118:20-120:18).

Plaintiff's calculation, which is based on Bethel's punch report (Def's Trial Ex. 19) contains numerous errors. Some of the more glaring errors include:

- Plaintiff claims she took vacation on November 29, 2012, but the records show she took vacation on November 30, 2012, and did not work on November 29, 2012, which means Plaintiff mistakenly included 7.5 hours of work into her calculation;

- Plaintiff called out sick on March 1, 2013, not March 2, 2012, and did not work on March 2, 2012, and thus again included 7.5 hours of work in her calculations that she did not work, which inclusion took her over 40 hours that week;

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

9

- On December 1, 2013, Plaintiff included 7.5 hours for a vacation day. The records show that Plaintiff did take vacation that day and thus Plaintiff mistakenly included 7.5 hours of work in her calculations that she did not work, which inclusion took her over 40 hours that week;

- On January 30, 2014, Plaintiff claims she worked 7.5 hours, and that she took a personal day the very next day. However, the records show that January 30, 2014 was given to Plaintiff as a holiday and that Plaintiff took a personal day on January 31, 2014. Therefore, Plaintiff mistakenly included 7.5 hours of work into her calculations that she did not work. (*See* Plf's Trial Ex. BP); and

- The damage calculation makes no deduction for gap-time claims which are simply not part of this case.

Lastly, Plaintiff failed at trial to discredit the testimony of Bethel's witnesses that neither one: (1) was aware of a single RN Charge Nurse who was deprived of overtime pay; (2) was aware of a single RN Charge Nurse who worked through his or her meal break without compensation; and neither of them knows of anyone who took any action to deprive anyone of overtime pay or pay for working through his/her meal break. (Keener Decl., ¶ 41; Graham Decl., ¶ 7, 9; Werlau Decl., ¶ 10, 14; Tayo Decl., ¶ 10, 14). Indeed, with Werlau and Graham having no financial incentive to lie or connection to Bethel, there is simply no reason to discount their unrebutted testimony.

## PROPOSED CONCLUSIONS OF LAW
## STANDARD GOVERNING PLAINTIFF'S CLAIMS

Plaintiff's claims are brought under the Fair Labor Standards Act ("FLSA"). (*See* SAC, *passim*). In order for Plaintiff to establish liability on a claim for unpaid overtime, she "must prove that [s]he performed work for which [s]he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kubel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946); *Tapia v. Blch 3rd Ave. LLC*, No. 14-cv-8529 (AJN), 2016 WL 4581341, at *4 (S.D.N.Y. Sept. 1, 2016) (noting that a FLSA claim requires a plaintiff to "bear the burden of proof to establish all claims and damages by a preponderance of the

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

10

evidence.") Thus, the **first step** in assessing Plaintiff's FLSA claim is to "determine whether [Bethel has] failed to keep accurate or adequate records." *McGlone v. Contract Callers, Inc.*, 49 F.Supp.3d 364, 371 (S.D.N.Y. 2014) (citations omitted).

Where an employer has kept proper and accurate records in accordance with the FLSA, and the employee was paid in accordance with the records it created, any inaccuracies in an employer's records are the result of the employee's failure to accurately report her time or follow the employer's policies. *Anderson*, 328 U.S. at 686-8. Indeed, where an employer keeps accurate records, an employee fails to meet her burden where she is unable "to provide specific facts establishing when, and for how long, [he or she] performed the off-the-clock tasks for which [she] now seek[s] compensation" and where "the undisputed fact [is] that plaintiff [never reported this work on [her] timesheets, and . . . that plaintiff['s] allegations rest solely upon [her] own bare recollections." *Joza v. WW JFK LLC*, No. 07-cv-4153 (ENV) 2010 WL 3619551, at *7 (E.D.N.Y. Sept. 9, 2010).

Therefore, for each pay period, Plaintiff must show that: (1) she worked more than 40 hours in a workweek; (2) she was not compensated for that overtime work; and (3) that Bethel knew or should have known that she was performing the uncompensated work. *Kubel*, 643 F.3d at 361; 29 U.S.C. § 207(a)(1).

### POINT I

### A SIGNIFICANT PORTION OF PLAINTIFF'S CLAIMS ARE BARRED UNDER THE APPLICABLE STATUTE OF LIMITATIONS

The FLSA carries a two-year statute of limitations. *See* 29 U.S.C. § 255(a). However, the limitations period is extended to three years where an employer's acts are found to be "willful." *See* 29 U.S.C. § 255(a). An employer willfully violates the FLSA when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the FSLA. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (citations

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

11

omitted). Mere negligence is insufficient. *Id.* Indeed, as recognized by the Supreme Court, "[t]he fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988). The burden is on the employee to show willfulness. *Id.* at 133.

For the reasons expressed above, Plaintiff has failed to meet her burden of showing any violation of FLSA, much less a willful violation. Notably, not a single witness testified to being aware of even a single instance of wrongfully unpaid overtime. To the contrary, Bethel maintained a lawful overtime policy and paid significant amounts of overtime to employees, including Plaintiff and her two trial witnesses, when the policy was followed. Bethel disciplined those employees who did not. Employees were required to sign for the policy, and were trained on the policy both at hire and periodically. In Plaintiff's case, she was asked to sign an agreement stating that she would honor the policy. This is the antithesis of "reckless disregard" for FLSA rights. Thus, a two-year statute of limitations period should be applied to Plaintiff's claims.

Here, the Complaint was filed on November 25, 2014, and ordinarily the applicable statute of limitations period would run from November 25, 2012, to November 25, 2014. However, 29 U.S.C. § 256(a) provides that:

> "In determining when an action is commenced for the purposes of section 255 of this title, an action commenced on or after May 14, 1947 under the Fair Labor Standards Act of 1938.... shall be considered to be commenced on the date when the complaint is filed; ***except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938...*** it shall be considered to be commenced in the case of any individual claimant--
> 
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint *and his written*

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

12

> *consent to become a party plaintiff is filed on such date in the court in which the action is brought…"*

29 U.S.C. § 256(a) (emphasis added). Many Circuits including Courts in the Second Circuit, have interpreted this section to mean that the statute of limitations period for a plaintiff representing a proposed collective begins when that representative plaintiff opts-into the action. *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012) ("Accordingly, courts construe the above language to do what it says: require a named plaintiff in a collective action to file a written consent to join the collective action.") (citing *In re Food Lion, Inc.*, Nos. 94–2360 et al., 151 F.3d 1029 (4th Cir. 1998); *Songu–Mbriwa v. Davis Mem'l Goodwill Indus.*, 144 F.R.D. 1, 2 (D.D.C. 1992)); *see also Hoffman v. Sbarro*, 982 F.Supp. 249, 260 (S.D.N.Y. 1997); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 198–99 (S.D.N.Y. 2006).

Williams opted-in on February 24, 2015 (ECF No. 11), and thus her claims under the FLSA that predate February 24, 2013, are time-barred.

## POINT II

### PLAINTIFF HAS FAILED TO DEMONSTRATE THAT BETHEL'S PAYROLL RECORDS ARE INACCURATE AND THUS THOSE RECORDS SHOULD BE ACCEPTED WHEN EVALUATING HER DAMAGE CLAIM

It is undisputed that Plaintiff's damages calculations rest on the accuracy of Bethel's Punch Detail Report. (Def's Trial Ex. 19). Thus, with the exception of Plaintiff's claim to off the clock work, Plaintiff has accepted the Punch Detail Report as accurate. Indeed, her entire damage model rests on the validity of the employer's records.

As to Plaintiff's off the clock claim, there was no competent proof offered at trial that Plaintiff worked an average of 7 extra and undocumented hours per week at Bethel. Not a single witness testified that Plaintiff performed this extra work (other than Plaintiff). All three of Plaintiff's Complaints alleged that Plaintiff worked between 41.5 and 45 hours per week,

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

and not one pleading mentions anything about Plaintiff being instructed to clock out and return to work.

Further, when asked at deposition who told Plaintiff to clock out and return to work, Plaintiff could only name a former supervisor named "Rupa". Yet, at trial, Plaintiff testified it was Graham, Werlau and Tayo who instructed her in this fashion, perhaps because she knew Rupa was not scheduled to testify at trial Bethel's behalf. (Plf's Decl., ¶ 17). Plaintiff has no proof whatsoever, other than her self-serving testimony that is belied in countless ways, that she was ever told to clock out and return to work. When compared with the more credible trial testimony of Graham – a practicing nurse for 35 years, now retired, who vehemently opposed ever engaging in such conduct and expressly stated she would have disciplined any supervisor who had (Graham, at 234:6-11, 234:12-21, 244:23-245:10); Werlau – a former ADON of Bethel with no reason to lie who spent countless hours training employees on the proper overtime protocols, and testified that she rarely if ever denied an overtime request and that she never denied one of Williams' requests (Werlau, at 273:5-15, 274:6-276:14); and Tayo – who denied this allegation and denied even having the authority to reject an overtime request (Tayo, at 292:4- 295:21, 307:5-308:12). Plaintiff's allegations are meritless.

Additionally, Plaintiff stated under oath in interrogatory answers, as admitted at trial, that she worked for other employers simultaneously with Bethel at an average of 24-27 hours per week. (Def's Trial Ex. 5, at No. 6; Williams, at 43:11-45:12). This further undermined her damage calculations because no one could rationally accept that she worked 80-100 hours a week. Further, at deposition and again at trial, Plaintiff testified that, when she was allegedly told to work off the clock, she would always clock out at the time clock on the first floor because the basement time clock was too far away. (Williams, at 46:23-55:6). However, Plaintiff's own damage calculations is completely contradicted by her admissions, as that document includes many weeks and months of alleged "off the clock work" where Plaintiff

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

14

had clocked out in the basement. Indeed, over a 4-month period between January and May 2014, Plaintiff only clocked out at the first floor time clock 1 time. (*Id.*) Nonetheless, Plaintiff still claims to be owed an average of 7 off the clock hours *per week* for various weeks where the uncontroverted records show she clocked out in the basement. (*Cf.* Plf's Trial Exs. BP & F *with* Williams 46:23-55:6).

Under these circumstances, allowing Plaintiff to recover what amounts to an extra shift per week for over 120 weeks in undocumented off the clock work against Bethel, a non-profit, would be, totally unprecedented, and patently unfair to this non-profit.

### POINT III

**EVEN IF PLAINTIFF CAN PROVE BETHEL'S TIME RECORDS ARE INACCURATE, AND PROVES BY A PREPONDERANCE OF THE EVIDENCE SHE WAS UNDERPAID, BETHEL HAS MORE THAN ESTABLISHED THAT PLAINTIFF'S RECOLLECTION IS UNWORTHY OF CREEDANCE**

Where an employer's payroll records are inaccurate or incomplete, courts generally apply a burden-shifting approach to determine whether the employee has been underpaid and, if so, by how much. *Anderson*, 328 U.S. at 687. An employee meets her burden at this first step where she "can prove that she 'in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Hernandez v. Jrpac Inc.*, No. 14-cv-4176 (PAE), 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016) (quoting *Anderson*, 328 U.S. at 687). This burden is "not high" and may be met "through estimates based on [the employee's] own recollection." *Kuebel*, 643 F.3d at 362.

If the employee makes this showing, the burden then shifts to the employer to either come forward with evidence of the precise amount of work performed or to "negative the reasonableness of the inference to be drawn from the employee's evidence." *Jrpac*, 2016 WL 3248493, at *27 (quoting *Anderson*, 328 U.S. at 687-88). "If the employer fails to [do so], the

15

court may then award damages to the employee, even though the result be only approximate." *Id.* at 688; *see also Gonzalez v. Masters Health Food Service, Inc.*, 2017 WL 3825960, at *16 (S.D.N.Y. July 27, 2017).

Here, Plaintiff also bears the burden of demonstrating that she performed off the clock work that was more than *de minimis*, for which she was not compensated, and that Bethel was aware that she were performing such unpaid off the clock work. *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998). As explained above, Plaintiff has failed to meet her burden as she has failed to come forth with any credible evidence, other than her own "say so", of having worked uncompensated overtime or performed off the clock work.

However, even if this Court were to credit Plaintiff's testimony sufficient for her to overcome the first step of the burden-shifting approach, Bethel has come forth with an abundance of evidence that discredits Plaintiff's recollection. As detailed above, Plaintiff has never, throughout the history of this litigation, provided a single date when she was instructed to clock out and return to work and stated repeatedly under oath (at deposition and in interrogatories) that she could not recall the specific number of hours that she was supposedly directed to work off the clock. Further, as detailed above, Plaintiff's "damages calculations", admitted over Bethel's objections for the reasons outlined in its in limine motion, were entirely unbelievable.

The evidence and testimony at trial showed an employee who signed for and acknowledged Bethel's lawful wage and hour policies, and actually followed them to seek overtime when it suited her. Indeed, Plaintiff collected a significant amount of overtime pay for overtime hours worked in accordance with Bethel's policies on numerous occasions. (Def's Trial Exs. 9, 13, 17, 19, 20). The evidence and testimony at trial further showed an employee who never once brought these allegations to Bethel's attention (prior to

commencing this action) without the issues having been addressed. (Keener, at 188:8-189:13; Graham, at 235:20-236:6, 240:5-241:1; Werlau, at 270:9-272:25).

Therefore, the Court should enter judgment dismissing Plaintiff's claims.

### POINT IV

### PLAINTIFF CANNOT BRIDGE THE GAP TO GET TO HOURS OVER 40 TO ESTABLISH ENTITLEMENT TO RELIEF UNDER THE FLSA SINCE SHE DISMISSED HER STATE LAW CLAIMS

Plaintiff has dismissed all of her claims brought under the New York State Labor Law with prejudice and only seeks to recover under the FLSA.

Plaintiff was scheduled to work 37.5 hours per week. It is well-settled that the FLSA only covers hours worked over 40 in a given week. This leaves a window of 2.5 hours per week that must be closed before Plaintiff could establish a claim under the FLSA as a matter of law. Plaintiff's damage calculations failed to deduct this gap time.

In other words, Plaintiff must prove a legal entitlement to be paid compensation for those hours, under a cognizable legal theory, before the FLSA can even be implicated. Plaintiff dismissed her NYLL claims in a "so ordered" stipulation and her "gap" time claims (e.g., non-minimum claims for working uncompensated time under 40 hours), are simply not actionable under the FLSA. She therefore has no legal theory for getting from 37.5 hours to over 40 hours in any week. Respectfully, if the Court were to award Plaintiff any damages for unpaid overtime, it should deduct all "gap time", as a matter of law since the Court lacks jurisdiction to determine that straight time under 40 hours was compensable and not paid. *See Lundy v. Catholic Health System of Long Island, Inc.,* 711 F.3d 106, 115-16 (2d Cir. 2013) ("we now hold that FLSA does not provide for a gap-time claim even when an employee has worked overtime…").

*Lundy* expressly holds that FLSA ***does not and cannot*** provide a remedy for unpaid straight time. *Id.* at 116 ("So long as an employee is being paid the minimum wage or more,

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

FLSA does not provide recourse for unpaid hours below the 40–hour threshold, even if the employee also works overtime hours the same week."). Therefore, without some pendent jurisdiction over a state claim that would adjudicate a finding that Plaintiff worked sufficient straight time to get to the threshold of overtime that has not been paid, the Court is simply without jurisdiction to give a remedy under the FLSA for this "gap time".

## POINT V

### PLAINTIFF HAS FAILED TO DEMONSTRATE LIABILITY FOR UNPAID MEAL BREAKS

Under the FLSA, an employer's timekeeping policies are lawful as long as they "allow[] for the complete and accurate recording of all time worked." *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011). There is no prohibition against requiring an employee to report having worked in order to receive pay for time worked and where an employer sets up a "reasonable process for an employee to report uncompensated time," it "is not liable for non-payment if the employee fails to follow the established process." *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 322 (E.D.N.Y. 2014); *Kuebel*, 643 F.3d at 355-57. This is true even where an employer's timekeeping policies include an auto-deduct policy. *DeSilva*, 27 F.Supp.3d at 322 ("It simply cannot be the case that merely establishing a process for an employee to report overtime worked transforms a legal policy, namely 'auto-deduct,' into an illegal one.").

To establish liability with respect to meal breaks, Plaintiff must prove that she performed work during her meal break for which she was not properly compensated. *Lundy*, 711 F.3d 106l; *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 853 F. Supp. 2d 290, 300-301 (E.D.N.Y. 2012); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 396 (W.D.N.Y. 2014). Plaintiff has not met this burden.

The undisputed evidence in this case establishes that Bethel maintained a lawful policy providing for the auto-deduction of Plaintiff's meal breaks. Plaintiff has not come forth with any credible evidence to support her claim that she was required to work through her meal breaks without compensation. Not a single witness at trial (other than Plaintiff) testified that Plaintiff was forced to work through her meal break without compensation. To the contrary, Bethel's witnesses each testified that Plaintiff could have easily sought payment for any legitimately missed meal break had she informed management, and that she never did so.

## POINT VI

## LIQUIDATED DAMAGES ARE INAPPROPRIATE HERE

Courts have the discretion not to award liquidated damages if an employer shows that any FLSA violations were in good faith. *See* 29 U.S.C. § 260; *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) ("To establish ... 'good faith,' an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them."). Plaintiff has not shown that Bethel's actions were willful sufficient to justify an award of liquidated damages. Bethel has established that it has acted in subjective good faith and with objective reasonableness. Bethel maintained a policy regarding meal breaks and overtime that it appears was closely followed by not just Plaintiff, but by Plaintiff's trial witnesses, Pryce and Ellis, as well. Indeed, the evidence at trial showed that Plaintiff was trained on Bethel's policies at the beginning of her employment and throughout and was asked to sign an agreement expressly re-acknowledging said policies when it was discovered that she had not been following same.

Further, not a single Bethel witness testified to being aware that Plaintiff, or any RN Charge Nurse for that matter, had been deprived of overtime or had been told to clock out and return to work. Graham, rather convincingly, testified that she would have disciplined any supervisor who gave such a blatantly illegal instruction. There was no proof at trial that

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

19

Bethel had reasonable grounds for believing its practices were in violation of the FLSA. To the contrary, Bethel maintained a lawful policy that required Plaintiff to seek prior approval before working overtime and to alert management to any missed meal breaks or pay check discrepancies. The evidence at trial further showed that Plaintiff (and Pryce and Ellis) availed herself of these policies on numerous occasions and, on those occasions, received any pay rightfully owed to her. Under these circumstances, liquidated damages are not appropriate. *See, e.g., Zacholl v. Fear & Fear, Inc.*, No. 01-cv-1953(FJS), 2004 WL 725964, at *4 (N.D.N.Y. Apr. 5, 2004).

### POINT VII

### IF THIS COURT AWARDS LIQUIDATED DAMAGES, THEN PLAINTIFF IS NOT ENTITLED TO RECOVER PREJUDGMENT INTEREST

If the Court were to award liquidated damages under either state or federal law, Plaintiffs are not entitled to recover pre-judgment interest. *See Rodriguez v. Queens Convenience Deli Corp.*, 2011 WL 4962397, at *6 (E.D.N.Y. Oct. 18, 2011) ("It is well settled that in an action for violations of the Fair Labor Standards Act prejudgment interest may not be awarded in addition to liquidated damages.") (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988)).

Dated: May 11, 2018

                                      **PECKAR & ABRAMSON, P.C.**

                                      */s/ Kevin J. O'Connor*
By: _____
        Kevin J. O'Connor, Esq.
        Joseph M. Vento, Esq.
        Peckar & Abramson, P.C.
        1325 Avenue of the Americas, 10th Floor
        New York, New York 10019
        *Attorneys for Defendant*

LAW OFFICES
Peckar & Abramson
A Professional Corporation