USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/09/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICOLA WILLIAMS,
                        Plaintiff,

-against-

THE BETHEL SPRINGVALE NURSING HOME, INC.,

                        Defendant.

No. 14-CV-09383 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Nicola Williams brought this action against her former employer, The Bethel Springvale Nursing Home, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), in the form of unpaid overtime wages.[1]

Following the completion of discovery and the parties' motion practice, the Court held a two-day bench trial from April 10, 2018 through April 11, 2018. Each trial witness's direct testimony was received in the form of a sworn declaration; cross-examination was conducted live, in court, throughout trial. (*See* ECF Nos. 103 & 105.) In addition to offering her own testimony, Plaintiff called two former Bethel employees, Cornelia Roberts-Pryce and Marsha Ellis, as witnesses. Defendants, in turn, called four current and former Bethel supervisors and directors, including Karen Werlau, Margie Graham, Michael Tayo, and Richard Keener. The parties filed their respective post-trial memoranda on May 11, 2018. (*See* ECF Nos. 112 & 113.)

---

[1] Prior to trial, Defendants reached a settlement in principle with opt-in Plaintiffs Shirley Nattoo, Marsha Ellis, and Cornelia Roberts-Pryce. The Court approved the settlement agreement on June 19, 2018. (*See* ECF No. 117.)

1

Based on the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, the Court finds that Defendant Bethel violated the FLSA's overtime requirements and that Plaintiff is entitled to compensatory and liquidated damages.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial 'must find the facts specifically and state its conclusions of law separately.'" *Pinovi v. FDD Enterprises, Inc.*, No. 13-CV-2800 (GBD) (KNF), 2015 WL 4126872, at *1 (S.D.N.Y. July 8, 2015) (quoting Fed. R. Civ. P. 52(a)(1)).

As the finder of fact in a bench trial, "the Court is entitled to make credibility findings about the witnesses and testimony and to draw reasonable inferences from the evidence presented" in reaching its factual findings. *CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, No. 16-CV-2030 (RJS), 2018 WL 2081860, at *1 (S.D.N.Y. Mar. 30, 2018); *Rana v. Bismillah Gyro, Inc.*, No. 15-CV-5104 (VMS), 2017 WL 1390666, at *2 (E.D.N.Y. Apr. 17, 2017) ("Part of the role of the trial court in creating a finding of fact is determining how much weight to afford any given witness's testimony and whether or not witnesses are credible." (citing *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012)).

Having reviewed the transcript of the trial as well as the parties' submissions, and having considered those materials in light of its own perception of the credibility of the witnesses who testified, the Court now sets forth its findings of fact and conclusions of law.

# FINDINGS OF FACT

## A. The Parties

Defendant Bethel Springvale Nursing Home, Inc. ("Bethel") is a 200-bed, not-for-profit nursing facility based in New York and dedicated to the care of the elderly. (Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl.'s FFCL") ¶ 2, ECF No. 113; Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s FFCL") at 1, ECF No. 112.)

Plaintiff Nicola Williams is licensed registered nurse ("RN") who was employed by Bethel from March 2012 until August 2014. (Pl.'s FFCL ¶ 1; Def.'s FFCL at 1.) As an RN Charge Nurse, Plaintiff reported to Bethel's RN Supervisor. (Decl. of Richard Keener ("Keener Decl.") ¶ 6, ECF No. 103.) The RN Supervisor, in turn, reported to the Assistant Director of Nursing ("ADON"), who reported to Bethel's Director of Nursing ("DON"). (*Id.*)

From the start of her employment in March 2012 until July 2012, Plaintiff's direct supervisor at Bethel was Rupa Naik, who supervised all of Bethel's units during the night shift. (Pl.'s FFCL ¶ 8; Trial Transcript ("Tr.") at 28:22–29:4, 190:19–191:6, ECF Nos. 109 & 111.) Beginning in July 2012, Alfred Michael Tayo replaced Naik as Bethel's night-shift RN Supervisor. (Tr. 30:20-25; Declaration of Michael Tayo ("Tayo Decl.") ¶ 3, ECF No. 103.)

During their respective tenures as RN Supervisors, Naik and Tayo both reported to Karen Werlau—Bethel's ADON from September 2010 until September 2014. (Tr. at 257:9-12.) As Bethel's ADON, Werlau reported to Margie Graham, who served as Bethel's DON from early 2013 until April 2014. (Tr. 214:4-5.)

## B. Plaintiff's Wages, Scheduled Hours, and Duties

During her employment with Bethel, Plaintiff worked primarily in the Rehabilitation Unit during the night shift; that is, from 11:00 P.M. until 7:15 A.M. (Pl.'s FFCL, ¶ 12; Def.'s FFCL at 1–2; Declaration of Plaintiff Nicola Williams ("Williams Decl.") ¶¶ 4–6, ECF No. 105.) Approximately twice a month, however, Plaintiff would work the day shift from 7:00 A.M. until 3:15 P.M. (Tr. 76:20–77:8.)

Plaintiff was paid a regular rate of $35.00 per hour and was entitled to an overtime rate of $52.50 per hour for any hours worked in excess of forty per week. (Def.'s FFCL at 1–2; Pl.'s FFCL ¶ 11.)

Bethel typically scheduled its nurses for eight-hour-and-fifteen-minute shifts each day to ensure a fifteen-minute overlap between the day and night shifts. (Pl.'s FFCL ¶ 14; Tr. 160: 6–12.) This overlap provided the night-shift nurse an opportunity to give the relieving day-shift nurse written and verbal updates on each patient in the unit. (*Id.*) Moreover, the outgoing and incoming nurses were expected to jointly review and reconcile how much medication had been dispensed with how much medication remained, called the "narcotics count." (*Id.*)

Also included in the nurses' eight-hour-and-fifteen-minute shift was a forty-five minute unpaid meal break that Defendant would automatically deduct from the nurses' compensation. (Pl.'s FFCL, ¶ 15; Def.'s FFCL at 2–3; Tr. 17:15–17, 161: 13-15.) Thus, Defendant typically compensated nurses, like Plaintiff, for seven and a half hours of work per day, five days per week—totaling 37.5 compensable hours in a typical work week. (Pl.'s FFCL, ¶ 16; Def.'s FFCL at 2; Williams Decl. ¶ 6; Keener Decl. ¶¶ 8–9.)

## C. Bethel's Time-Keeping and Overtime Policies

Throughout Plaintiff's employment, Defendant utilized a timeclock system to keep track of its employees' work hours. (Pl.'s FFCL ¶ 18; Def.'s FFCL at 4.) Nurses were required to clock-in and out of their shifts at one of two time clocks in the facility—the first located in the basement, near the building's rear entrance, and the other on the first floor. (Def.'s FFCL at 4; Keener Decl. ¶ 11; Williams at 13:16–14:15.) However, employees were not required to clock in and out for their meal breaks. (Def.'s FFCL at 4.)

While Bethel's official policy was to award overtime pay for any hours worked in excess of forty per week, employees were required, whenever possible, to obtain pre-approval for their overtime work. (Def.'s FFCL at 2; Graham Decl. ¶ 6.)

Bethel's policy for compensating overtime hours that were not pre-approved by management, however, remains opaque. An employee seeking compensation for unapproved overtime is required to let their supervisor know that they worked beyond their scheduled shift and provide the reason for such work. (Def.'s FFCL at 2; Keener Decl. ¶ 18.) Whether the RN Supervisors—like Michael Tayo and Rupa Naik—had the authority to deny an ex post facto overtime compensation requests is unclear.

Margie Ruth Graham, the Director of Nursing during Plaintiff's employment with Bethel, suggested that the Supervisors *could* reject an employee's requests for compensation for overtime they had already performed. (Tr. at 217:1–218:12.) In such instances, Graham further testified, employees were required to raise any grievances relating to rejected overtime requests with the higher management. (*Id.* at 218:6-12.)

However, Karen Werlau—Bethel's Assistant Director of Nursing from September 2010 through September 2014—testified that the RN Supervisors did *not* have the authority to reject

5

employees' request for overtime compensation. (*Id.* at 257:9-12, 258:24–259:10.) She maintained that the Supervisors were instead required to discuss any potential issues with overtime compensation requests directly with her. (*Id.*) Werlau and the RN Supervisor would then determine whether the employee was entitled to compensation for their overtime work, together. (*Id.*)

Yet, Michael Tayo—Plaintiff's direct supervisor from July 2012 onwards—testified that he was in no way involved with overtime compensation decisions. (*Id.* at 283:1-8, 288:22–289:10, 289:22–290:9, 293:25–294:16.) Rather, Tayo maintained that he would simply sign the form verifying that the employee had, indeed, been present in the building and note that the requested overtime had not been pre-approved. (*Id.*) Tayo further testified that, to his best recollection, he never discussed any requests for overtime compensation with Karen Werlau. (*Id.* at 296:3-13.)

Moreover, Richard Keener, the Director of Human Resources at Bethel, testified that Bethel did not have a specific policy in place to address overtime compensation requests that were denied. (*Id.* at 176:9-14.) Nor did Bethel have a policy of tracking the rejected overtime requests or the overtime hours they reflected. (*Id.* at 176:21–178:5.)

### D. Employees' Off-the-Clock Hours

Witnesses offered differing accounts of whether Bethel employees, like Plaintiff, often worked hours that were not properly recorded by Bethel's time-keeping procedures and that slipped through the cracks of Bethel's opaque overtime compensation policy. Before setting out its findings, the Court summarizes the relevant trial testimony.[2]

---

[2] The Court does not venture to summarize the trial testimony of *every* witness, but instead discusses the trial testimony that was most relevant to its present findings. *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, 399 F. App'x 637, 639 (2d Cir. 2010) (summ. order) ("Rule

### i. Plaintiff Nicola William's Testimony

Plaintiff testified that she would frequently be required to work in excess of her scheduled hours throughout her employ with Bethel. For instance, Plaintiff claimed to have, more often than not, worked through the entirety of her unpaid forty-five minute meal break. (Williams Decl. ¶ 9.) Indeed, Plaintiff contends that she worked through *every* meal break, all five days per week that she was scheduled for the night shift. (*Id.*)

Plaintiff additionally testified that she frequently had to work beyond her scheduled shifts in order to properly complete her required duties, including providing the relieving day nurse with the morning report and performing the narcotics count. (*Id.* ¶ 13; Tr. at 93:11–95:4.) Plaintiff testified that on a typical day, the morning report and narcotics count—both of which required the relieving morning nurse's presence—would take nearly forty-five minutes to complete. (Tr. at 93:22–94:13.) Bethel's policy, however, was to only schedule fifteen minutes of overlap between the shifts. Accordingly, Plaintiff maintains that she was required to stay at least thirty minutes beyond her scheduled shift every morning to complete the narcotics count and morning report. (Pl.'s FFCL ¶ 29.) However, Plaintiff contends that she would nevertheless clock out at the end of her shift and continue working, because she was encouraged to do so by different supervisors at Bethel. (Williams Decl. ¶ 17.)

Despite her regular off-the-clock overtime work, Plaintiff further testified, her requests for overtime compensation were frequently rejected by the RN Supervisors. (*Id.* ¶ 14.)

---

52(a) requires the court to make sufficiently detailed findings to inform the appellate court of the basis of the decision to permit intelligent appellate review[,] . . . . [it] does not require either punctilious detail [ ] or slavish tracing of the claims issue by issue and witness by witness." (internal quotation marks and citations omitted)).

### ii. Marsha Ellis' Testimony

Marsha Ellis, an RN formerly employed by Bethel, testified that from time to time, she acted as the relief nurse for Plaintiff. (Tr. at 146:21-23.) As the relief nurse, Ellis would have to complete the morning report and narcotics count with Plaintiff. By Ellis' account, the morning report involved detailed updates on approximately thirty-eight patients, including any changes in health conditions. (*Id.* at 147:3-6.) Those morning reports, Ellis further testified, lasted around fifteen to twenty minutes each morning. (*Id.* at 147:7-12.) In addition, Ellis and Plaintiff were required to complete a "narcotics count," which according to Ellis, typically added another twenty-five minutes to their mandatory morning routine. (*Id.* at 147:15-17.)

Moreover, like Williams, Ellis maintained that she was frequently required to work through her meal breaks to complete her duties. (*Id.* at 141:16-18.) And like William, Ellis testified that Bethel supervisors frequently refused to sign compensation requests for overtime hours that she had already worked. (*Id.* at 149:23–150:3.) Additionally, Ellis testified that she complained to Karen Werlau about frequently missing her meal breaks, but to no avail. (*Id.* at 145:3-7.)

### iii. Cornelia Roberts-Pryce's Testimony

Another nurse formerly employed by Bethel, Cornelia Roberts-Pryce, largely corroborated the testimony of Williams and Ellis regarding uncompensated overtime work typically performed by Bethel's nurses. Specifically, Roberts-Pryce, like Williams, testified that she often worked through her meal break while covering the night shift in Bethel's rehab unit. (*Id.* at 136:18–20.) Roberts-Pryce explained that during the night shift, there is only a single nurse on duty. (*Id.* at 137:1-4.) As the only individual with access to the narcotics box, that nurse is responsible for administering any required medications—a responsibility that could not be

delegated to another employee. (*Id.*) As a result, Roberts-Pryce further testified, her meal break would often be interrupted when she had to tend to the needs of the unit's patients. (*Id.*)

Roberts-Pryce also corroborated Williams' testimony that the daily morning report and narcotics count with the relieving nurse each required around thirty minutes to complete—requiring the night shift nurse to stay at least half an hour past the end of their scheduled shift. (*Id.* at 134:1–135:1.) However, like Williams, Roberts-Pryce testified that she would clock out at the end of her shift and return to work to complete these duties. (*Id.* at 127:2-20.) Indeed, Roberts-Pryce indicated that Bethel generally required its nurses to clock out within minutes of their scheduled shift's end and that she had been reprimanded by Michael Tayo for failing to do so. (*Id.* at 127:11-14.) Thus, the pressure placed on nurses to clock out on time, coupled with the requirement that they complete the morning report and narcotics count with the relieving nurse, created the custom among Bethel nurses of clocking out but continuing to work after their scheduled shifts. (*Id.*)

Finally, like Williams and Ellis, Roberts-Pryce also testified that Bethel supervisors had, in the past, refused to sign her requests for overtime compensation, even after she had already worked the overtime hours. (*Id.* at 138:10–16.)

### iv. Michael Tayo's Testimony

Michael Tayo, who was hired as Bethel's night supervisor in July 2012, testified that he never observed Plaintiff clock out and then return to finish her work. (*Id.* at 283:1-20; 315:24–316:5.) He also testified that although Plaintiff was vocal about her employment-related grievances, she never voiced any concerns regarding her missed meal breaks. (*Id.* at 316:6-8.) Moreover, Tayo testified that Plaintiff could not have skipped *all* of her meal breaks because he would, on occasion, take his meal break with Plaintiff. (316:9-17.) Indeed, Tayo described

9

Plaintiff's "good" Caribbean food, which she would sometimes share with him during this break time. (*Id.*)

      v.      **This Court's findings**

Given the corroboration from other former Bethel employees that nurses often had their meal breaks interrupted and the fact that Plaintiff was the *only* nurse available to tend to patients' needs and administer medications during the night shift, the Court places some credence in Plaintiff's testimony that she often performed compensable work during her unpaid meal breaks. While the Court acknowledges that Plaintiff's meal breaks were likely frequently interrupted by her duties, however, the Court finds it very unlikely that Plaintiff worked through the entirety of her meal break every day she was scheduled on the night shift—particularly in light of Tayo's testimony that he would occasionally join Plaintiff and enjoy her Caribbean cooking during such breaks. Accordingly, the Court credits Plaintiff's testimony to the extent it suggests that she would, on occasion, work through portions of her unpaid meal break. Given the testimony of all witnesses, the Court finds an approximation that Plaintiff worked through an average of one-half of each of her meal breaks reasonable.

Similarly, the Court finds Plaintiff's testimony that she often worked past her scheduled shifts in order to complete the morning report and narcotics count credible. Each of the nurses formerly employed by Bethel offered consistent testimony regarding how onerous and time-consuming the morning report—which required giving updates for approximately thirty patients—and narcotics count could be. The Court is, thus, persuaded that Plaintiff was

frequently required to work at least thirty minutes beyond her regularly scheduled shift to complete these tasks. [3]

While the Court credits Plaintiff's testimony that she would frequently continue working after having "clocked out," the Court also notes that both parties submitted records detailing the time and location Plaintiff "clocked in" and "clocked out" using Bethel's time clocks. (*See* Tr. 46:23–47:5; Pl.'s Ex. F.) These records indicate that, on certain occasions, Plaintiff would clock out in the basement—that is, at the exit closest to the rear parking lot, where Plaintiff typically parked her car. (*Id.*) On these occasions, the Court finds it unlikely that Plaintiff went from the first floor, where the rehab unit is located, to the timeclock in the basement, only to return to work on the first floor—particularly when there was a timeclock much more conveniently located on the first floor. (Tr. at 47:10-15.) Rather, the Court finds that when Plaintiff clocked out in the basement, she left Bethel for the day and did not work any off-the-clock hours. Thus, Plaintiff's own estimations must be reconciled with the clock-out information reflected in Bethel's records; Plaintiff is not entitled to any inference that she worked off-the-clock hours at the end of her shift on any day she clocked out in the basement.[4]

---

[3] In her proposed findings of fact and conclusions of law, Plaintiff also seeks to recover for an additional ten minutes of off-the-clock work she allegedly required to complete her patient documentation each day. (*See* Pl.'s FFCL ¶¶ 31–36.) However, Plaintiff's trial testimony centered on her overtime work in relation to the morning report and narcotics count and largely omitted any direct explanation of her distinct documentation duties. Thus, the Court finds that Plaintiff has not established that she is entitled to an inference that she worked an average of ten *additional* minutes after completing the narcotics count and morning report each day. Indeed, unlike the morning report and narcotics count, which could not be completed without the relieving nurse, Plaintiff provided no reason why she would be unable to complete these additional ten minutes of work during her regularly scheduled shift.

[4] Plaintiff *is* still entitled, however, to the reasonable inference that she worked through half of her automatically deducted meal breaks on these days.

**CONCLUSIONS OF LAW**

   I.   **FLSA Overtime Violations**

      A. **Applicable Law**

With certain exceptions not relevant here, the FLSA requires employers to compensate their employees for any hours worked in excess of forty per week at a "rate not less than one and one-half times" their regular hourly rate. 29 U.S.C. § 207(a)(1); *see also Marcelino v. 374 Food, Inc.*, No. 16-CV-6287 (KPF), 2018 WL 1517205, at *16 n.21 (S.D.N.Y. Mar. 27, 2018).

To establish liability under the FLSA for improperly compensated overtime work, an employee must prove that: (1) they performed work for which they were not properly compensated, and (2) their employer had actual or constructive knowledge of that work. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).

Under the FLSA, it is the employer's duty to maintain accurate records of its employees' hours. *Lynch v. City of New York*, 291 F. Supp. 3d 537, 546 (S.D.N.Y. 2018); *see also* 29 U.S.C. § 211(c) (requiring employers subject to the FLSA to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"). This record-keeping duty is "non-delegable." *Kuebel*, 643 F.3d at 363. "In other words, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Id.*

"Where an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme to determine whether an employee has established that he was underpaid, and what damages he suffered." *Marcelino*, 2018 WL 1517205, at *15. In such instances, "an employee has carried out his burden if he proves that he has in fact performed

12

work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 362; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1040 (2016). The Second Circuit has noted that this burden "is not high" and may be satisfied through an employee's "estimates based on his own recollection." *Kuebel*, 643 F.3d at 362.

The Court notes, however, that while a plaintiff's recollection, alone, may be sufficient to establish a rebuttable presumption that he worked certain hours for which he was not compensated, "such testimony only establishes such a presumption if the testimony is credible." *Java v. El Aguila Bar Rest. Corp.*, No. 16-CV-6691 (JLC), 2018 WL 1953186, at *2 (S.D.N.Y. Apr. 25, 2018) (internal quotations marks omitted) (quoting *Romero v. Rung Charoen Sub, Inc.*, No. 16-CV-1239 (VMS), 2017 WL 4480758, at *4 (E.D.N.Y. Sept. 30, 2017)); *see also Daniels v. 1710 Realty LLC*, 497 F. App'x 137, 139 (2d Cir. 2012) (summ. order). In the context of a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited. And as the trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Java*, 2018 WL 1953186, at *2 (internal quotation marks omitted) (quoting *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012)).

If an employee satisfies this initial showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Tyson Foods*, 136 S.Ct. at 1047; *see also Kuebel*, 643 F.3d at 362. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may only be approximate." *Gonzalez v. Masters Health Food Serv. Inc.*, No. 14-CV-07603 (VEC),

2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (internal quotations omitted) (quoting *Kuebel*, 643 F.3d at 362).

### B. Application

In the present action, the Court finds that Plaintiff has carried her burden of establishing Defendant's violations of the FLSA's overtime requirements.

First, the Court finds that Bethel has failed to keep accurate records of their employees' working hours. Although Bethel maintained certain time records throughout Plaintiff's employ, the testimony of former employees established that Bethel did not properly track missed meal breaks. *See supra*, Findings of Fact, Sections C & D. Nor do Bethel's time records reflect their employees' practice of clocking-out and continuing their work past their regularly scheduled shifts—a practice likely encouraged by the very nature of the Bethel nurses' responsibilities. The mandatory morning report and narcotics count, for instance, required at least forty-five minutes to complete, but Bethel nurses were only allotted fifteen minutes to complete both tasks. Coupled with Bethel's policy of requiring nurses to clock out within minutes of the end of their regularly scheduled shifts, these time-consuming responsibilities undoubtedly pressured nurses to conduct "off-the-clock" work.

Despite Defendant's likely knowledge of this "off-the-clock" work, Bethel made no effort to track its employees' unrecorded overtime hours. Plaintiff offered her own testimony, as well as the testimony of other former employees, suggesting that Bethel supervisors were well aware that their nurses often worked during their meal breaks and past their scheduled shifts. Moreover, Williams, Ellis, and Roberts-Pryce, all provided similar accounts of Bethel supervisors: (1) denying their requests for overtime compensation *after* they had already completed the overtime work, and (2) ignoring their complaints about their frequently

14

uncompensated overtime hours. *See supra* Findings of Fact, Sections D(i), (ii), & (iii). Indeed, Richard Keener, the Director of Human Resources at Bethel, admitted that Plaintiff, on at least one occasion, complained to him directly about not receiving compensation for her overtime work. (*Id.* at 178:12-19.) Similarly, Margie Graham, Bethel's former Director of Nursing, testified that she received reports from various supervisors that Plaintiff often stayed at Bethel past her regularly scheduled shifts. (*Id.* at 243:5-20.) Despite these complaints from their employees and reports from their supervisors, Bethel did not have a clear policy to track or compensate any off-the-clock overtime hours. *See supra*, Findings of Fact, Section C.

Given Defendant's failure to maintain accurate time records, the Court finds that Plaintiff has carried her relatively limited burden of proving she performed overtime work for which she was not properly compensated. Not only do Defendants' own—incomplete—time and payment records reflect instances where Plaintiff worked uncompensated overtime hours, (s*ee* Tr. at 181:12–184:16), Plaintiff has also credibly established that she frequently worked unrecorded, or "off-the-clock," overtime hours that similarly went uncompensated. *See supra* Findings of Fact, Section D(v).

Moreover, although the Court does not credit the entirety of Plaintiff's testimony, *see Id.*, Plaintiff has carried her burden of establishing the extent of her uncompensated work "by just and reasonable inference." *See Kuebel*, 643 F.3d at 361. Namely, the Court has found that Plaintiff is entitled to an inference that: (1) she worked through an average of one-half of her meal breaks, and (2) she worked an average of an additional thirty minutes "off-the-clock" on days she clocked out on the first floor. *See supra* Findings of Fact, Section D.

Defendant, on the other hand, has not provided any evidence of the precise amount of work performed by Plaintiff or any evidence to negative the reasonableness of the above

15

inferences. Accordingly, the Court finds that Defendant is liable to Plaintiff for her unpaid overtime wages. The Court now turns to the issue of damages.

### II. Damages Calculation

#### a. Statute of Limitations

The Court finds that the relevant limitations period for Plaintiff's overtime claim is three years. The FLSA generally provides for a two-year statute of limitations. 29 U.S.C. § 255(a). However, the statute of limitations extends to three years where the FLSA violation is deemed "willful." *Id.*; *see also Kuebel*, 643 F.3d at 366.

"An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." *Kuebel*, 643 F.3d at 366 (internal quotation marks omitted). "Where a defendant is on notice of its unlawful practices, but nevertheless continues them, willfulness may be found." *Lynch*, 291 F. Supp. 3d at 549. District courts in this Circuit have, thus, "generally found willfulness where there is no real dispute that the employer had been on notice that it was subject to the FLSA." *Juarez-Cardoso v. La Flor de Santa Ines, Inc.*, No. 15-CV-6671 (VMS), 2017 WL 4357009, at *12 (E.D.N.Y. Sept. 29, 2017) (collecting cases). Ultimately, the employee "bears the burden of proof on the issue of willfulness for statute of limitations purposes." *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (internal quotation marks omitted).

Here, the testimony of Bethel management established their clear knowledge the FLSA's overtime requirements. (*See, e.g.*, Tr. at 245:1-7.) Indeed, Bethel's Human Resources Director, Richard Keener, testified that he would attend conferences at least twice a year to stay up-to-date and informed regarding proper overtime compensation policies. (Tr. at 192:5-11.) Mr. Keener additionally testified that he frequently attended "law breakfasts" hosted by the Society of

Human Resources Management, which included presentations updating members regarding any changes to the FLSA. (*Id.* at 192:15-20.)

Despite these efforts to stay abreast of the FLSA's requirements, Bethel supervisors repeatedly failed to comply with the Act. Even Keener himself admitted that, on at least one occasion, he failed to address or follow up with the overtime grievances Plaintiff brought directly to his attention. (Tr. at 178:12–181:1.)

The Court finds that Defendant's failure to properly compensate its employees despite its clear knowledge of FLSA's requirements constitutes a willful violation of the law. *See Medina v. E. Commc'n Inc.*, No. 16-CV-869 (JCG), 2018 WL 2899658, at *3 (S.D.N.Y. June 11, 2018) (finding defendants' FLSA violations willful where defendants "were aware of the basic overtime rules and requirements under the law to pay Plaintiff an overtime rate when Plaintiff worked over 40 hours," but failed to do so); *see also Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 87 (E.D.N.Y. 2012) (finding three-year statute of limitations applied where defendant admitted that it was "aware of the FLSA minimum wage and overtime requirements" during plaintiff's employment). Accordingly, Plaintiff is entitled to recover unpaid wages for any overtime she worked dating back three years prior to the commencement of this action.[5]

---

[5] As Defendants correctly note, however, pursuant to 29 U.S.C. § 256(a), a collective FLSA action is considered to be commenced in the case of any individual claimant "on the date when the complaint is filed, if [that claimant] is specifically named as a party plaintiff in the complaint *and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought . . .*". 29 U.S.C. § 256(a) (emphasis added). Courts have interpreted this provision to mean that the limitations period for a plaintiff representing a proposed collective begins not when the complaint is filed, but when that representative plaintiff officially opts-into the action. *See Contrera v. Langer*, 290 F. Supp. 3d 269, 278 (S.D.N.Y. 2018); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012).

Although the Complaint was filed on November 25, 2014 in the present action, Plaintiff did not officially opt-in until February 24, 2015. (*See* ECF Nos. 1, 11.) Accordingly, the limitations period extends back to February 24, 2013.

### b. Liquidated Damages

"An employer who violates the FLSA's overtime requirements is generally liable to its employee for the employee's 'unpaid overtime compensation' as well as 'an additional equal amount as liquidated damages.'" *Cuahua v. Tanka Japanese Sushi Inc.*, No. 14-CV-4177 (ER), 2017 WL 4357980, at *5 (S.D.N.Y. Sept. 29, 2017) (quoting 29 U.S.C. § 216(b)).

Notably, "[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 143 (2d Cir. 1999). As such, employees demonstrating FLSA overtime violations are presumptively entitled to liquidated damages. *See Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 718 (2d Cir. 2014) (summ. order).

Employers, thus, carry the burden of proving that they had "a reasonable, good-faith belief of compliance" with the FLSA to overcome an employee's presumptive entitlement to liquidated damages. *Id.*; *see also* 29 U.S.C. § 260 (noting that "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the FLSA violation] was in good faith and that he had reasonable grounds for believing that his act or omission" did not violate the FLSA, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof" not to exceed 100% of actual damages). "To establish the requisite subjective good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (internal quotation marks omitted). The Second Circuit has characterized this burden as "a difficult one," noting that "double damages [are] the norm and single damages the exception." *Id.* (internal quotations omitted).

18

Here, Defendant have failed to establish a good-faith basis for having failed to pay the required overtime wages. As this Court has already determined, Bethel supervisors were aware of the FLSA's overtime requirements, but nonetheless failed to properly compensate Plaintiff—both refusing her requests for overtime compensation and ignoring her overtime grievances. Accordingly, Plaintiff is entitled to liquidated damages equaling 100% of the total unpaid wages.

### c. Prejudgment Interests

Under the FLSA, "prejudgment interest may not be awarded in addition to liquidated damages." *Pineda v. Frisolino, Inc.*, No. 15-CV-3774 (GBD), 2017 WL 3835882, at *13 (S.D.N.Y. Aug. 29, 2017) (internal quotation marks omitted) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988)). Because the Court finds that Plaintiff is entitled to liquidated damages in the present action, Plaintiff cannot also recover any prejudgment interests.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court finds that Plaintiff has proven, by a preponderance of evidence, that Defendant violated the Fair Labor Standards Act by failing to properly compensate her for her overtime work. For these violations, Plaintiff is entitled to compensatory and liquidated damages.

Plaintiff is directed to provide Defendant an updated damages calculation, accounting for this Court's above findings, on or before July 25, 2018. In preparing such calculations, Plaintiff should bear in mind the following:

(1) Plaintiff is entitled to an inference that she worked, on average, through *half* of her meal breaks;

(2) Plaintiff is entitled to an inference that she worked an additional thirty minutes off-the-clock only on days she clocked out on the first floor;

(3) as Plaintiff's only remaining overtime claims are pursuant to FLSA, she is only entitled to recover wages for hours worked *in excess* of forty per week, *see Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 116 (2d Cir. 2013) (noting that "[s]o long as an employee is being paid the minimum wage or more, FLSA does not provide recourse for unpaid hours below the 40-hour threshold, even if the employee also works overtime hours the same week"); and

(4) Plaintiff's calculations should account for overtime work for which she *did* receive adequate compensation.

Defendant shall provide Plaintiff any objections to the proposed damages calculation, explaining clearly and with specificity the basis for any disagreement, on or before August 15, 2018.

Finally, the parties are directed to submit a joint damages calculation to this Court no later than August 22, 2018.

Dated: July 09, 2018
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge